UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARTIN BELTRAN,

Plaintiff,

v.

NATIONSTAR MORTGAGE LLC,

Defendant.

Case No.  25-cv-04412-JSC

**ORDER RE: MOTION TO TRANSFER VENUE**

Re: Dkt. No. 24

Martin Beltran, individually and on behalf of a putative class, sues Nationstar Mortgage LLC, d/b/a Mr. Cooper ("Mr. Cooper"), alleging it illicitly tracked and disclosed consumer personal and financial information to third parties without authorization.  (Dkt. No. 26.)[1] Defendant moves to transfer venue to the United States District Court for the Northern District of Texas pursuant to 28 U.S.C. § 1404(a) based on a forum selection clause in its website's Terms of Use.  (Dkt. No. 24.)  After carefully considering the parties' submissions, having had the benefit of oral argument on November 20, 2025, and having considered the parties' February 2026 supplemental submissions, the Court **GRANTS** Defendant's motion to transfer venue. Defendant's webpage provided Plaintiff with reasonably conspicuous notice that he was agreeing to Defendant's Terms of Use, making the agreement enforceable.  As the forum selection clause is not ambiguous, and Plaintiff does not otherwise challenge the enforceability and applicability of the forum selection clause itself or present sufficient public-interest factors disfavoring transfer, the forum selection clause warrants transfer to the Northern District of Texas.

//

//

//

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the document.

United States District Court
Northern District of California

**BACKGROUND**

## I.  FIRST AMENDED COMPLAINT ALLEGATIONS

Mr. Beltran is a resident of California and Defendant Mr. Cooper is a Delaware Corporation with a principal place of business in Coppell, Texas.  (Dkt. No. 26 ¶¶ 17, 18.)  Defendant is a mortgage lender and servicer.  (*Id.* ¶ 2.)  To provide its mortgage services, "Mr. Cooper operates and encourages its customers to use its website … on which customers can, among other things, access their account information, manage their mortgage, obtain information about Mr. Cooper's services, calculate and obtain quotes for mortgage payments and refinancing options, and apply mortgages or refinancing." (*Id.*)  Unbeknownst to users, Defendant installed third-party tracking technology on its website to collect and share users' personal and financial information with third parties without authorization.  (*Id.* ¶ 3.)

## II.  PROCEDURAL HISTORY

Martin Beltran, Nicolle Ayers, and Patrice Norwood, individually and on behalf of a putative class, filed suit in May 2025.  (Dkt. No. 1.)  In August 2025, Defendant filed motions to dismiss the case for lack of jurisdiction and to transfer venue to the Northern District of Texas.  (Dkt. Nos. 24, 25.)  In September, Mr. Beltran filed the operative First Amended Complaint removing the other plaintiffs and becoming the sole plaintiff.  (Dkt. No. 26.)  Mr. Beltran brings causes of action for (1) negligence; and violations of the (2) Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502; (3) California's Consumer Protection Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; and (4) California Consumer Privacy Act, Cal. Civ. Code § 1798.100, *et seq.*  (Dkt. No. 26 ¶ 15.)   Plaintiff also brings claims for (5) breach of express and implied contract; (6) unjust enrichment; (7) breach of confidence; and violations of the (8-10) California Invasion of Privacy Act, Cal. Penal Code §§ 631, 632, 638.51, *et seq.*; and (11) Electronic Communications Privacy Act, 18 U.S.C. § 2511(1), *et seq.*  (*Id.*)  Now pending is Defendant's motion to transfer venue.  (Dkt. No. 24.)

## III. RELEVANT FACTS RE: TERMS OF USE

In 2019, Plaintiff obtained a mortgage through Bank of America.  (Dkt. No. 26 ¶ 123.)  Two years later, Plaintiff's mortgage was transferred from Bank of America to Defendant.  (*Id.* ¶

124.)  Bank of America instructed Plaintiff to make an account with Defendant to pay his mortgage, which Plaintiff did.  (*Id.* ¶¶ 124, 128.)

To create an account on Defendant's website, a user first encounters a webpage where they can input their last name and social security number:



(Dkt. No. 24-3 at 2; Dkt. No. 24-1 ¶ 11.)

After inputting their information and clicking "Find My Loan," the user sees a webpage like this:

(*Id.*)  The parties do not dispute Plaintiff encountered these same webpages in creating an account. (Dkt. No. 29 at 9-10 ("Mr. Cooper offers two screenshots of the web pages Plaintiff Beltran would have seen during this process." (citing Dkt. No. 24-3)).)  The second webpage page states in large print, "Create your Mr. Cooper Account."  (Dkt. No. 24-3.)  The page is white and most of the text is gray apart from "Create your Mr. Cooper account" and "Password Requirements."  (*Id.*)  Near the top of the page, there are gray text instructions to fill in and confirm sign-in information and create a password.  (*Id.*)  There is a gray box above the space to enter a password containing a blue shield symbol and password requirements.  (*Id.*)  At the bottom of the page there is a dark blue "Save & Continue" button.  (*Id.*)  Directly above this button, the webpage states "By clicking 'Save & Continue' you agree to the ***Terms of Use*** for Mr. Cooper's website" in a font smaller than the rest of the text except for the password requirements.  (*Id.*)  The Terms of Use text is bolded, italicized, blue, and hyperlinks to the full Terms of Use.  (*Id.*; Dkt. No. 24-1 ¶ 12.)

Clicking on the hyperlink opens the Terms of Use in a new window.  (Dkt. No. 24-1 ¶ 13.) The top of the Terms of Use page states: "NOTICE: PLEASE READ THESE TERMS AND CONDITIONS CAREFULLY.  BY ACCESSING THIS SITE AND ANY PAGES THEREOF,

4

YOU AGREE TO BE BOUND BY THE TERMS AND CONDITIONS BELOW." (Dkt. No. 24-2 at 2.) The Terms of Use include a forum selection clause which provides:

> The user's access to and use of the Mr. Cooper websites and mobile apps, and the terms of this disclaimer are governed by all applicable Federal laws and the laws of the state of Texas; and the user agrees that venue shall be located in Dallas County, Texas.

(*Id.* at 7.) The Terms of Use also represent that Defendant "take[s] your privacy seriously" and instructs customers to read the privacy policy for details regarding Defendant's privacy practices. (*Id.* at 5; Dkt. No. 26 ¶ 79.) Plaintiff alleges the Privacy Policy created a contractual relationship between Plaintiff and Defendant. (Dkt. No. 26 ¶ 78.)

After making an account, Plaintiff regularly used Defendant's website "to review his account, manage his mortgage, and make payments." (*Id.* ¶ 126.) "He has been using the website anywhere between a few times a month to a few times a week since 2021-2022." (*Id.*)

## DISCUSSION

### I. MOTION TO TRANSFER

Defendant moves to transfer under 28 U.S.C. § 1404(a) based on the forum selection clause in its website's Terms of Use. Defendant argues the case should be transferred to the Northern District of Texas because: (1) the forum selection clause is valid and enforceable, (2) the forum selection clause encompasses Plaintiff's claims against Defendant, and (3) the public-interest factors do not overwhelmingly disfavor transfer. "In considering a motion to transfer, the Court may consider evidence outside of the pleadings, and it draws all reasonable inferences and resolves factual conflicts in favor of the non-moving party." *Davis v. New York Life Ins. Co.*, 2024 WL 100277, at *1 n.1 (N.D. Cal. Jan. 9, 2024) (cleaned up).

Under 28 U.S.C. § 1404(a) a district court may "transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented … [f]or the convenience of parties and witnesses." 28 U.S.C. § 1404(a). In considering such a transfer, the court "must evaluate both the convenience of the parties and various public-interest considerations" weighing "the relevant factors and decid[ing] whether, on balance, a transfer would serve 'the convenience of parties and witnesses' and otherwise promote

United States District Court
Northern District of California

'the interest of justice.'" *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 62–63 (2013) (quoting 28 U.S.C. § 1404(a)). "The calculus changes, however, when the parties' contract contains a valid forum-selection clause, which represents the parties' agreement as to the most proper forum." *Id.* at 63 (cleaned up). Under such circumstances, "a proper application of § 1404(a) requires that a forum-selection clause be given controlling weight in all but the most exceptional cases." *Id.* at 59–60 (cleaned up). By "[e]nforc[ing] ... valid forum-selection clauses, bargained for by the parties, [the court] protects their legitimate expectations and furthers vital interests of the justice system." *Id.* at 63 (cleaned up). Accordingly, when presented with such an agreement, the court must disregard the plaintiff's choice of forum and the parties' private interests. *Id.* at 63–64. It instead "consider[s] arguments about public-interest factors only," and "those factors will rarely defeat a transfer motion." *Id.* at 64. Further, "the party acting in violation of the forum-selection clause ... must bear the burden of showing that public-interest factors overwhelmingly disfavor a transfer." *Id.* at 67.

It is undisputed Plaintiff made an account on Defendant's website. (Dkt. No. 26 ¶ 123 ("Plaintiff Beltran opened an online account with Mr. Cooper.").) Defendant contends, in making an account, Plaintiff agreed to the website's Terms of Use, which bind Plaintiff to the forum selection clause selecting Dallas County Texas. (Dkt. Nos. 24-1 ¶¶ 9-10; 24-2 at 7.) The present venue dispute, as set forth in the parties' original briefing, centers on the validity of the Terms of Use agreement containing the forum selection clause. If Plaintiff is bound by the Terms of Use, the parties do not dispute the forum selection clause is valid and encompasses Plaintiff's claims.

### A. Agreement to the Terms of Use

As an initial matter, the Court applies California law to resolve this dispute. While the parties do not discuss what law applies to the contract formation question, both rely on *Lee v. Ticketmaster L.L.C.*, 817 F. App'x 393 (9th Cir. 2020), which applied California law on contract formation. *Id.* at 394. So, the Court assumes the parties agree to apply California law to the question of contract formation. *See Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1267 (9th Cir. 2006) (finding waiver of choice of law provision and applying California law when parties proceeded on the assumption that California law governs).

United States District Court
Northern District of California

As the party seeking to enforce the forum selection clause, Defendant "bears the burden of proving the existence of an agreement ... by a preponderance of the evidence." *Norcia v. Samsung Telecomms. Am., LLC.*, 845 F.3d 1279, 1283 (9th Cir. 2017) (cleaned up). "To form a contract under ... California law, the parties must manifest their mutual assent to the terms of the agreement." *Berman v. Freedom Fin. Network*, *LLC*, 30 F.4th 849, 855 (9th Cir. 2022). "Parties traditionally manifest assent by written or spoken word, but they can also do so through conduct." *Id.* "However, '[t]he conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents.'" *Id.* (alteration in original) (quoting Restatement (Second) of Contracts § 19(2) (1981)). "These elemental principles of contract formation apply with equal force to contracts formed online. Thus, if a website offers contractual terms to those who use the site, and a user engages in conduct that manifests her acceptance of those terms, an enforceable agreement can be formed." *Id.* at 855–56.

In California, "internet contracts are classified 'by the way in which the user purportedly gives their assent to be bound by the associated terms: browsewraps, clickwraps, scrollwraps, and sign-in wraps.'" *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024) (quoting *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 463 (2021)). Although Plaintiff did not need to indicate he had read and agreed to the Terms of Use to make an account on Defendant's website, Defendant argues by clicking "Save & Continue" during the account creation process Plaintiff agreed to the Terms of Use. This process is a "sign-in wrap agreement" wherein

> a user signs up to use an internet product or service, and the sign-up screen states that acceptance of a separate agreement is required before the user can access the service. While a link to the separate agreement is provided, users are not required to indicate that they have read the agreement's terms before signing up.

*Sellers*, 73 Cal. App. 5th at 464. For the sign-in wrap agreement to be enforceable, the website operator must show the user had "actual knowledge" or "inquiry notice" of the agreement. *Berman*, 30 F.4th at 856.

Defendant does not contend Plaintiff had actual knowledge of the Terms of Use agreement and so proceeds on an inquiry notice theory. An enforceable agreement based on inquiry notice

7

requires: "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Id.*

### 1.   Reasonably Conspicuous Notice

To determine whether a website provides reasonably conspicuous notice of its terms such that a "reasonably prudent Internet user would have seen it," courts consider "the context of the transaction and the placement of the notice." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 515-16 (9th Cir. 2023) (cleaned up). For instance, in transactions that entail a continuing relationship, as opposed to one-time website visit, courts assume a reasonably prudent user would expect the continuing relationship to be governed by some terms and thus be on notice of a link to those terms. *See Sellers*, 73 Cal. App. 5th at 476–77 (noting a user would expect an ongoing relationship with contractual terms when they download an app and register for an account, but not when the user merely begins a $5 trial). As for notice placement, certain factors are relevant to the "visual analysis of webpages and hyperlinks, such as the location of the advisal on the webpage or the font size, color, and contrast." *Godun v. JustAnswer LLC*, 135 F.4th 699, 709 (9th Cir. 2025); *see also Berman*, 30 F.4th at 856–57 (considering notice to be insufficiently conspicuous when the notice was printed in a "barely legible" gray font that also failed to denote the existence of a hyperlink in a recognizable way, such as in blue font or all capitalized letters).

Plaintiff insists under both considerations, notice was not reasonably conspicuous. First, in the context of the transaction between Plaintiff and Defendant, a consumer would not expect to agree to new terms and conditions. Second, the design of the webpage and placement of the Terms of Use notice are insufficient to provide reasonably conspicuous notice. Neither argument is persuasive.

### i.   Transaction Context

The transaction context supports conspicuous notice. Plaintiff was required to make an account to pay his mortgage through Defendant's website, which included entering his name, social security number, contact information, and creating a password. (Dkt. No. 26 ¶¶ 123, 124; Dkt. No. 24-3.) As opposed to a one-off website visit, the requirement of "a full registration

8

process[] reflect[s] the contemplation of 'some sort of continuing relationship' that would have put users on notice for a link to the terms of that continuing relationship." *See Oberstein*, 60 F.4th at 517 (quoting *Sellers*, 73 Cal. App. 5th at 477).  Indeed, Plaintiff's creation of an account to make *monthly* mortgage payments necessitated a continuing relationship with Defendant.  (Dkt. No. 26 ¶¶ 124, 126.)  And Plaintiff did engage in a continuing relationship with Defendant, using the website "anywhere between a few times a month to a few times a week since 2021-2022."  (*Id.* ¶ 126); s*ee also Sarhadi v. Pear Health Labs, Inc.*, 2025 WL 1350033, at *6 (N.D. Cal. Apr. 18, 2025) (considering the context of the transaction, when the plaintiff was "required to create an Aaptiv account and then engaged in an ongoing relationship with Aaptiv," to weigh in favor of conspicuous notice); *Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911, 926 (N.D. Cal. 2024) (finding a user signed up for a continuing service like Coursera "would … expect (or should expect) their access to the platform would be continual and governed by some terms of use").

Plaintiff's argument otherwise misconstrues the context of the transaction.  In essence, Plaintiff contends a consumer would not expect their mortgage terms to change due to the mortgage being transferred to a new mortgagee; so, Plaintiff would not have expected to be agreeing to additional terms and conditions with his new mortgage servicer.  However, the agreement with Defendant is not a new agreement on a preexisting loan—it is an agreement to the *website's terms*.  The Terms of Use make clear they govern "[t]he user's access to and use of the Mr. Cooper websites and mobile apps," not the substantive terms of the loan.  (Dkt. No. 24-2 at 7.) Thus, the correct question is not whether a consumer would expect the terms of their loan to change, it is whether a consumer would expect registering with a new website to make mortgage payments to be accompanied by new terms and conditions.  They would.  Indeed, Plaintiff, in his Amended Complaint, relies on Defendant's representations as to user privacy in both its Terms of Use and Privacy Policy to allege Defendant breached its "privacy contracts" with its users.  (Dkt. No. 26 ¶¶ 78-79, 227, 230.)  So, although Plaintiff's counsel argues Beltran would not have expected additional terms to accompany his new relationship with Defendant, Beltran's claims expressly rely on new privacy terms to make claims against Defendant.  (*Id.*); *see, e.g.*, *Hart v. Charter Commc'ns, Inc.*, 2017 WL 6942425, at *4 (C.D. Cal. Nov. 8, 2017), *aff'd*, 814 F. App'x

211 (9th Cir. 2020) (finding the plaintiffs' declarations that the 2017 statements provided sufficient notice "defeat[ed] their challenge that the notice of the 2014 [statements] was not reasonably conspicuous" because the 2017 statements "included notices … which were just as prominently displayed as the notices in the 2014 statements") (cleaned up).  So, drawing reasonable inferences from the evidence in Plaintiff's favor, the Court cannot conclude a reasonable consumer would not have expected new terms of use on a website new to the consumer.

Plaintiff also cites *Seneca v. Homeaglow, Inc.*, 2024 WL 750029 (C.D. Cal. Feb. 7, 2024), for the proposition a user would have no reason to expect new terms because the Terms of Use appear after Plaintiff had already entered his last name and social security number.  But *Seneca* is distinguishable because there the terms of service were presented only after customers completed the purchase and the website charged the customer's credit card, at which point customers "would have no reason to expect the post-hoc imposition of terms and conditions to the previous purchase."  *Id.* at *4.  In contrast, here, the Terms of Use are not imposed "post-hoc" because the website presents the hyperlinked Terms of Use after identifying information is entered, but before the user completes the process of creating their account or makes any payment to Defendant.

Lastly, Plaintiff asserts the new terms are adhesive because internet contracts "are mostly contracts of adhesion" and "consumers do not generally have the ability to negotiate."  (Dkt. No. 29 at 8.)  Plaintiff cites no cases to support this argument.  At oral argument, Plaintiff argued, for the first time, that he had to make an online account, and thus agree to the Terms of Use, to make a mortgage payment, thus disputing Defendant's insistence the Terms of Use are not adhesive because Defendant did not require Plaintiff to make an online account to pay his mortgage.  (Dkt. No. 36 at 10 n.3.)  So, the Court granted the parties leave to submit additional evidence and argument on whether a consumer in Plaintiff's circumstances had to create an online account to make a mortgage payment.  Defendant submitted evidence establishing Plaintiff was *not* required to pay his mortgage through the website and, in fact, Plaintiff made one mortgage payment by phone and six by wire.  (Dkt. No. 49-1.)  Plaintiff's two supplemental briefs do not address the

United States District Court
Northern District of California

issue. (Dkt. Nos. 48, 51.)  So, his oral argument assertion he was required to make mortgage payments through the website is meritless.

Accordingly, the transaction's context supports conspicuous notice because, drawing reasonable inferences from the record in Plaintiff's favor, Plaintiff, in undergoing a registration process to make ongoing payments, should have anticipated terms and conditions to govern his ongoing relationship with Defendant.

### ii. Notice Placement

The placement of Defendant's Terms of Use is conspicuous and puts a reasonable user on notice they are agreeing to be bound by the terms.  The webpage states, "By clicking 'Save & Continue' you agree to the ***Terms of Use*** for Mr. Cooper's website."  (Dkt. No. 24-3.)  While the text of the advisal is primarily the same gray color as most of the webpage's other text, the Terms of Use are bolded, italicized, and blue.  (*Id.*)  The text's blue color contrasts the rest of the white page and the surrounding text, making it easier for a user to see the Terms.  (*Id.*)  The page is uncluttered and the statement including the Terms of Use is directly above the "Save & Continue" button, so a reader would naturally see the notice before their eyes move to "Save & Continue." (*Id.*)  Thus, the notice is "conspicuously displayed directly [above] the action button, the statement clearly denotes that continued use will constitute acceptance of the Terms of [Use], and the link to the Terms of [Use] is conspicuously distinguished from the surrounding text, by a contrasting" blue font color "denoting the existence of a hyperlink."  *Keebaugh*, 100 F.4th at 1020–21 (cleaned up); *see also Berman*, 30 F.4th at 857 ("A web designer must do more than simply underscore the hyperlinked text in order to ensure that it is sufficiently set apart from the surrounding text.") (cleaned up); *Lee*, 817 F. App'x at 394–95 (considering notice to be conspicuous when three lines below the sign-in button, "the website displayed the phrase, 'By continuing past this page, you agree to our Terms of Use,'" and the "'Terms of Use' was displayed in blue font and contained a hyperlink to Ticketmaster's Terms"); *Bender v. Twilio Inc.*, 2025 WL 2308484, at \*3 (N.D. Cal. Aug. 11, 2025) (finding advisal of terms to be conspicuous due to contrasting font, underlining, and location directly below the action button).

11

United States District Court
Northern District of California

Plaintiff disputes the conspicuousness of the notice, but the cases upon which he relies are distinguishable. For example, included below is the notice challenged in *Serrano v. Open Road Delivery Holdings, Inc.*, 666 F. Supp. 3d 1089 (C.D. Cal. 2023), where the small, light-colored notice blended into the white background and was not immediately adjacent to the action button. *Id.* at 1096. Further, the court gave significant weight to "the failure to identify the hyperlink to Defendant's Terms of Use by more than mere underlining." *Id.*



*Id.* at 1093.

12

Similarly, in *Kuhk v. Playstudios Inc.*, 2024 WL 4529263 (W.D. Wash. Oct. 18, 2024), the notice (reproduced below) was "significantly smaller" than surrounding text, "and the color of the notice [was] so similar to the background color of the game homepage that it [was] barely visible to the naked eye." *Id.* at *6. Additionally, the webpage did not clearly suggest the existence of a hyperlink because the hyperlink was not underlined or in a font color "so contrasting as to clearly suggest that it [was] a hyperlink," and it was "relatively inconspicuous compared to the bright, flashing lights of the logo above it." *Id.* at *7.





*Id.* at *1.

While Plaintiff insists the notice's font here is "tiny," the "text is presented in a hardly visible light gray color," and the other elements of the page draw a user's eye away from the notice, Defendant's webpage is a far cry from those at issue in *Serrano* and *Kuhk*. (Dkt. No. 29 at 12.) The notice, while in a slightly smaller font than some of the other text, is still legible. (Dkt. No. 24-3.) And the blue Terms of Use contrast the white background, making the notice easier to

see and drawing the user's attention. (Dkt. No. 24-3.) Relatedly, unlike in *Serrano* and *Kuhk*, the blue, bolded, and italicized Terms of Use signify a hyperlink. (Dkt. No. 24-3.) And there are no distracting elements separating the notice from the action button. (*Id.*) Rather, the notice is directly above the action button. (*Id.*) Accordingly, the Court can "fairly assume that a reasonably prudent Internet user would have seen it." *See Berman*, 30 F.4th at 856.

***

So, for the reasons explained above, the transaction context and notice placement on Defendant's website provided reasonably conspicuous notice of the Terms of Use.

### 2.  Consumer Action

The requirement a consumer take some action to manifest assent is also met. "[A] webpage must explain that certain actions will be understood by the offeror to signal assent to contractual terms … [a]nd it must identify what, exactly, those actions are." *Godun*, 135 F.4th at 711. Defendant's website does so. Defendant's website states: "By clicking 'Save & Continue' you agree to the **Terms of Use** for Mr. Cooper's Website." (Dkt. No. 24-3.) Plaintiff was therefore advised pressing "Save & Continue" would manifest assent to the Terms of Use, and he does not dispute he did press "Save & Continue" to make an account. So, Plaintiff manifested assent to the Terms of Use.

Plaintiff nevertheless argues "a user creating a password automatically through a browser like Chrome (which provides users with the ability to auto-generate secure passwords, as many other browsers now do) and pressing 'Tab' and 'Enter' could auto-generate a password without even having to click the 'Save and Continue' button, which does not include a separate checkbox to assent to the Terms of Use." (Dkt. No. 29 at 13.) But Plaintiff does not allege or even argue *he* bypassed the "Save & Continue" button through use of an autogenerate a password feature. That a user could theoretically do so does not impact assent in this case.

### 3.  Forum Selection Clause Ambiguity

At oral argument, Plaintiff argued for the first time the venue clause is ambiguous as to requiring venue in Texas, and therefore the motion to transfer should be denied. Although the argument was made too late, the Court ordered the parties to submit supplemental briefing on the

14

United States District Court
Northern District of California

United States District Court
Northern District of California

issue.  Federal law governs interpretation of a forum selection clause, even in a diversity jurisdiction case.  *See Manetti-Farrow, Inc. v. Gucci Am., Inc.,* 858 F.2d 509, 513 (9th Cir. 1988).

The forum selection clause is included in the following Terms of Use paragraph:

> Limitation Of Liability
> IN NO EVENT WILL MR. COOPER BE LIABLE FOR ANY DIRECT, INDIRECT, PUNITIVE, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER BASED IN CONTRACT, TORT, STRICT LIABILITY OR OTHERWISE) TO THE USER AND/OR ANY THIRD PARTY, ARISING IN CONNECTION WITH THIS SITE OR USE THEREOF OR INABILITY TO USE BY ANY PARTY, OR IN CONNECTION WITH ANY FAILURE OF PERFORMANCE, ERROR, OMISSION, INTERRUPTION, DEFECT, DELAY IN OPERATION OR TRANSMISSION, COMPUTER VIRUS OR LINE OR SYSTEM FAILURE, EVEN IF MR. COOPER, OR REPRESENTATIVES THEREOF, ARE ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, LOSSES OR EXPENSES. **The user's access to and use of the Mr. Cooper websites and mobile apps, and the terms of this disclaimer are governed by all applicable Federal laws and the laws of the state of Texas; and the user agrees that venue shall be located in Dallas County, Texas.**

(Dkt. No. 30-3 at 6–7 (emphasis added).)  Defendant contends the last sentence constitutes the clause selecting Dallas County, Texas as the forum for all disputes arising from the website, as do Plaintiff's claims.  "The plain language of the contract should be considered first, with the understanding that the common or normal meaning of language will be given to the words of a contract unless circumstances show that in a particular case a special meaning should be attached to it."  *Simonoff v. Expedia, Inc*., 643 F.3d 1202, 1205 (9th Cir. 2011) (interpreting a forum selection clause under federal law).  A plain reading of the clause is that claims involving use of Mr. Cooper's websites are "governed by all applicable Federal laws and the laws of the state of Texas" and shall be venued in Dallas County, Texas.  Venue could only refer to the location of lawsuits arising from "access to and use of" the websites.  This interpretation is further compelled by the clause's location in the section entitled "Limitation of Liability"—liability arises from lawsuits.  *See also Venue*, Black's Law Dictionary (12th ed. 2024) (defining "venue" as "[t]he proper or a possible place for a lawsuit to proceed …."); 28 U.S.C. § 1391(b) ("Venue in general.—A civil action may be brought in" certain "judicial district[s]").

15

United States District Court
Northern District of California

Plaintiff first argues the sentence's failure to state "all disputes", or something similar to "all disputes shall be venued in Texas" renders the clause ambiguous and therefore requires it be construed in Plaintiff's favor.  But Plaintiff does not cite any cases that address interpretation of a forum selection clause and, importantly, he does not offer an alternative interpretation.  If the clause's plain meaning is not that lawsuits regarding use of the website must be venued in Texas, what is an alternative meaning?  Plaintiff speculates only that the clause could mean "a user is agreeing that venue of their access to the website is located in Dallas." (Dkt. No. 48 at 4.)  But what does that mean?  Plaintiff does not explain and thus does not proffer a reasonable alternative interpretation of the clause that would render it ambiguous.

Next, Plaintiff also argues forum selection clauses always refer to venue of disputes or lawsuits or something similar.  But Plaintiff is incorrect.  *See, e.g., Damian v. David Green Org., LLC*, 2006 WL 8455335, at *1 (S.D. Cal. July 6, 2006) (granting motion to transfer when forum selection clause stated, "[t]his agreement shall be interpreted and enforced in accordance with the laws of the State of Illinois and venue shall only be in Cook County, Illinois"); *Pong v. Am. Cap. Holdings, Inc.*, 2007 WL 657790, at *2 (E.D. Cal. Feb. 28, 2007) (enforcing forum selection clause stating that, "This note ... shall be construed, governed and enforced in accordance with the laws of the State of Florida with venue being agreed to as Palm Beach County, Florida"); *Masters v. Ctr. for Fin., Legal & Tax Plan., Inc.*, 2020 WL 13228365, at *3 (S.D. Tex. Aug. 27, 2020) (same for forum selection clause stating, "[b]oth Parties . . . [a]gree and consent to the jurisdiction and application of Illinois laws and that venue shall be in Williamson county").

***

Accordingly, Defendant has met its burden to show the parties formed a valid and enforceable agreement through Plaintiff's creation of an account on the website.  Plaintiff does not dispute the forum selection clause's validity or enforceability (other than claiming an interpretation ambiguity) or that Plaintiff's claims arise from Plaintiff's "access to and use of the Mr. Cooper websites and mobile apps."  (Dkt. No. 24-2 at 7.)  So, the forum selection clause applies.

//

### B. Remaining § 1404(a) Analysis

Because the parties' contract contains a valid forum-selection clause, the forum selection clause is given "controlling weight in all but the most exceptional cases" and the Court disregards Plaintiff's choice of forum and the parties' private interest factors. *Atl. Marine Const.*, 571 U.S. at 63–64 (cleaned up). The Court only considers public-interest factors. *Id.* at 64. "As the party acting in violation of the forum-selection clause, [Plaintiff] must bear the burden of showing that public-interest factors overwhelmingly disfavor a transfer." *Id.* at 67.

Public interest factors include "the administrative difficulties flowing from court congestion[,] the local interest in having localized controversies decided at home[,] and the interest in having the trial of a diversity case in a forum that is at home with the law." *Id.* at 62 n.6. (cleaned up). Plaintiff contends the local interest factor weighs against transfer because "Mr. Cooper chose to purchase mortgages in California and then sold the data of California consumers like Plaintiff." (Dkt. No. 29 at 17.) But this alone is insufficient to show the public interest *overwhelmingly* disfavors transfer particularly when other factors weigh in favor of transferring. For instance, the Northern District of Texas is less congested than the Northern District of California. (Dkt. No. 24 at 17-18 ("As of December 2024, the Northern District of California had … 753 cases per judgeship … and a 34.5-month time from filing to trial for civil cases; whereas the Northern District of Texas had … 632 cases per judgeship … and a 20.8-month time from filing to trial for civil cases.").) And the Northern District of Texas has more familiarity with the governing Texas Law. (Dkt. No. 24-2 at 7 ("[U]se of the Mr. Cooper websites ... are governed by all applicable Federal laws and the laws of the state of Texas.").)

Accordingly, the forum selection clause controls and warrants transfer of this case to the Northern District of Texas.

//

//

//

//

//

17

**CONCLUSION**

For the reasons set forth above, the Court **GRANTS** Defendant's motion to transfer venue to the Northern District of Texas pursuant to 28 U.S.C. § 1404(a).

This order disposes of Dkt. No. 24.

**IT IS SO ORDERED.**

Dated: March 6, 2026

_____
JACQUELINE SCOTT CORLEY
United States District Judge

United States District Court
Northern District of California

18